```
1                   UNITED STATES DISTRICT COURT
                            FOR THE
2                     DISTRICT OF VERMONT

3

4    Melissa Davis and           )
     Estate of Gregory Davis     )
5                                 )
                                  )
6    v.                           ) Case No. 5:22-cv-123
                                  )
7                                 )
     Serhat Daniel Gumrukcu       )
8                                 )
     _____)
9

10   RE:  Hearing on the Motion to Enforce Writ of Attachment
          (Doc. 22), Emergency Motion to Intervene (Doc. 23),
11        Emergency Motion to Clarify Order of Approval of Writ of
          Attachment (Doc. 24), Motion for Reconsideration of Order
12        Granting Extension of Time (Doc. 27), and Motion to Amend
          Complaint (Doc. 38)
13
     DATE:  March 16, 2023
14
     LOCATION:  Rutland, Vermont
15
     BEFORE:  Honorable Geoffrey W. Crawford
16            Chief District Judge

17

18   **APPEARANCES**:

19   Paul J. Perkins, Esq.
     Plante & Hanley, P.C.
20   82 Fogg Farm Road
     P.O. Box 708
21   White River Junction, VT 05001-0708

22   Stefan Ricci, Esq.
     Martin, Delaney & Ricci Law Group
23   85 Main Street
     Windsor, VT 05089
24

25                   - Continued on Next Page -
```

1    Lisa B. Shelkrot, Esq.
     Langrock, Sperry & Wool, LLP
2    210 College Street
     P.O. Box 721
3    Burlington, VT 05402-0721

4    Heather E. Ross, Esq.
     Sheehey, Furlong & Behm, P.C.
5    30 Main Street, 6th Floor
     P.O. Box 66
6    Burlington, VT 05402-0066

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                   (The Court opened at 1:30 p.m.)
 2                   COURTROOM DEPUTY:  Your Honor, this is Case Number
 3        22-CV-123, Melissa Davis and Estate of Gregory Davis versus
 4        Serhat Daniel Gumrukcu.  Present on behalf of the plaintiffs
 5        are Attorneys Paul Perkins and Stefan Ricci.  Present on behalf
 6        of the defendant is Lisa Shelkrot, Attorney Lisa Shelkrot,
 7        excuse me.  Present on behalf of Intervenor William Anderson
 8        Wittekind is Attorney Heather Ross.  And we are here for a
 9        motion to enforce writ of attachment, an emergency motion to
10        intervene, emergency motion to clarify order of approval of
11        writ of attachment, motion for reconsideration of order
12        granting extension of time, and motion to amend complaint.
13                   THE COURT:  All right.  Good to see everybody.
14                   ATTORNEY SHELKROT:  Good afternoon, Your Honor.
15                   ATTORNEY ROSS:  Good afternoon, Your Honor.
16                   ATTORNEY PERKINS:  Good afternoon.
17                   THE COURT:  No.  I appreciate your all coming, and
18        I'm glad to have kind of a full deck of lawyers in for the
19        case.  The case has kind of got off to a, a slow start from my
20        perspective, not that there's any rush.  It was filed in June,
21        and, after a little bit of back-and-forth, the Court issued the
22        writ of attachment in July, and, as Ms. Ross pointed out,
23        normally, we'd have a hearing right away on an ex parte writ,
24        but this case took a funny direction.
25             The defendant, Dr. Gumrukcu, has filed until now a series
```

1    of requests for continuance so as to excuse him from answering

2    or otherwise filing anything, which I granted.  He was

3    detained, and, and there didn't seem to be urgency from his

4    perspective.

5         And Mr. Wittekind I didn't know anything about.  I had

6    caught sight of him, I think, at a bail hearing or something of

7    the sort, so I knew that there was a husband out there, but I

8    had no kind of formal information, and it turned out, as it

9    happened, that he had actually gone to a different court in New

10   York State, chose not to come here to raise these issues until

11   now, went elsewhere, which is certainly his prerogative, but

12   now, when he came here and entered an appearance through you,

13   Ms. Ross, in November, we made efforts to try and get this on.

14   There were, I was out of commission in December, and I forgot

15   what happened.  Ms. Shelkrot entered an appearance in February,

16   and but here we are.  So, just for the record, that's why it

17   has taken so long to get from the ex parte stage to a full

18   hearing on, on the attachment.

19        I wrote down, in preparing for the hearing, I made a list

20   of questions that I hope to kind of leave with answers to.  I

21   thought I might go through these questions and then turn things

22   over to you.  The first one nobody may know the answer.

23        Does anyone know exactly what JP Morgan Securities is

24   holding for Dr. Gumrukcu or for Mr. Wittekind, for that matter?

25             ATTORNEY ROSS:  Your Honor, I understand that JP

1      Morgan is holding, in a brokerage account, paper stock

2      certificates that, approximately 3.6 million paper stock

3      certificates, the title to those in Mr. Wittekind's name;

4      approximately 12 billion paper stock certificates in Mr., in

5      Dr. Gumrukcu's name; and approximately 89,000 paper stock

6      certificates in both of their names, in their names jointly.

7      So it's as Anderson, William Anderson Wittekind and Serhat

8      Gumrukcu.

9              THE COURT:  And the 3.6 million, those are the ones

10     that Mr. Wittekind wants released, right?

11             ATTORNEY ROSS:  Correct.

12             THE COURT:  And were they issued to him before the

13     murder -- there's clearly a murder.  I make no suggestion as to

14     who was responsible -- but before the murder and before the

15     indictment, or is it something more recent?

16             ATTORNEY ROSS:  Most certainly before the indictment.

17     So, as I understand the series of events from reading the

18     indictment and the wrongful death action, the alleged murder

19     took place in or about January of 2018.

20             THE COURT:  Right.

21             ATTORNEY ROSS:  There was the merger that formed the

22     creation of Enochian Biosciences that had been in the works but

23     actually took effect sometime thereafter, that spring, maybe,

24     and these securities, or at least Mr. Wittekind's securities,

25     these Enochian Biosciences securities for Mr. Wittekind, were

1    issued in that time period right after the merger.

2              THE COURT:  And when was that?

3              ATTORNEY ROSS:  In or about the spring of 2018.

4              THE COURT:  Spring of 2018?

5              ATTORNEY ROSS:  Correct.

6              THE COURT:  And was that also the case for the 12

7    million shares issued to Dr. Gumrukcu?

8              ATTORNEY ROSS:  I can't speak to that for certain.  I

9    think that it is.  It certainly couldn't be before that,

10   because Enochian didn't come into existence before that.

11             THE COURT:  Yeah, yeah.  Okay, thank you.  Is that

12   how the plaintiffs see it too?

13             ATTORNEY PERKINS:  Paul Perkins, Your Honor.  Just

14   trying to remember to say my name before I speak, because I've

15   been asked to do it by the clerk.

16             THE COURT:  Yeah, thank you.

17             ATTORNEY PERKINS:  Yes.  We believe that there are

18   paper certificates being held by JP Morgan, but we don't

19   actually know the answer to that --

20             THE COURT:  Right.

21             ATTORNEY PERKINS:  -- in part because Mr. Wittekind

22   has not disclosed that to us or to the Court.  So, in terms of

23   when the stock certificates were issued, we agree that they

24   were issued after the murder, because Enochian Biosciences was

25   formed after the murder --

1          THE COURT:  Right.

2          ATTORNEY PERKINS:  -- although its formation was in

3   process at the time of the murder, and I think the Court is

4   aware of the allegations about the motivation in connection

5   with the murder of Mr. Davis.

6          THE COURT:  Right.

7          ATTORNEY PERKINS:  We do have some SEC statements of

8   beneficial ownership with us that show some of the dates of

9   Mr. Wittekind's acquisition of those stock certificates, but we

10   don't believe that we have the complete set that would tell us

11   exactly how much he has and in which accounts they may be held

12   at JP Morgan.

13          THE COURT:  All right.  So that kind of takes us down

14   to Question 3.  Why don't we have JP Morgan Securities in this

15   case?  Is there some reason?

16          ATTORNEY PERKINS:  I'm aware of no reason, Your

17   Honor, why JP Morgan is not involved in this case, but we have

18   concluded that JP Morgan is not going to intervene in this

19   case, and, for that reason, we have prepared a motion to

20   intervene in the New York case, because --

21          THE COURT:  And I'm sorry if I can interrupt, but I

22   don't understand.  There may be good reasons for it, of course.

23   Is there some reason why you don't bring them into this case?

24   They're registered to do business in Vermont.

25          ATTORNEY PERKINS:  They do do business in Vermont.

1    We could potentially bring them into this case.  We think that
2    the issue should be decided in New York, though, because this
3    is a matter involving a property located in New York, held by a
4    New York corporation, pursuant to a contract that's governed by
5    New York law and on which the New York Supreme Court has
6    already issued orders about, and Mr. Wittekind is maintaining
7    the lawsuit in New York, despite having intervened here asking
8    for the same relief in this court that he's asked in New York.
9            THE COURT:  I'm sorry.  You're in for who?
10           ATTORNEY PERKINS:  I'm in for Mrs. Davis.
11           THE COURT:  Yeah, that's what I thought.
12           ATTORNEY PERKINS:  Yeah.
13           THE COURT:  And Mr. Wittekind started the case in New
14    York?
15           ATTORNEY PERKINS:  He did.
16           THE COURT:  But you have fallen in love with that
17    idea, and you prefer to have the New York Supreme Court rule on
18    the validity of your Vermont attachment?
19           ATTORNEY PERKINS:  Well, certainly not because we
20    don't trust Your Honor to do it.  I think you would do a fine
21    job.
22           THE COURT:  No, I don't take it personally.  It just
23    seems weird.
24           ATTORNEY PERKINS:  Well, I agree, there's a lot of
25    weirdness about this case.

```
 1                  THE COURT:  Right.

 2                  ATTORNEY PERKINS:  But we think that, because the

 3       litigation over this issue was started in New York by

 4       Mr. Wittekind and orders had already been issued by the New

 5       York Supreme Court before Mr. Wittekind even entered into this

 6       case, that New York is the proper forum for the determination

 7       of whether the stock certificates purportedly in

 8       Mr. Wittekind's name should be released to Mr. Wittekind.

 9                  THE COURT:  And what role will this court play then?

10       Should I just dismiss the attachment proceeding and let you do

11       whatever you do in New York?

12                  ATTORNEY PERKINS:  No, Your Honor, we, we don't wish

13       to have the attachment proceeding dismissed.

14                  THE COURT:  Right.

15                  ATTORNEY PERKINS:  As we see it, we have a valid

16       attachment on all of Mr. Gumrukcu's stock in, in Enochian

17       Biosciences.  The issue that's really arisen is, What stock

18       does he own?  We contend that he owns all of the stock

19       contained in the joint account, because he signed a joint

20       account agreement saying that he owned all of the stock in that

21       account.  We know that Mr. Wittekind takes a different

22       position.

23                  THE COURT:  Right.  Yes, but what do you want me to

24       do then with the various motions, just leave them alone and

25       wait to receive sort of advice from the New York court as to
```

1    what to do?

2              ATTORNEY PERKINS:  What we would like is for the

3    attachment to remain in place --

4              THE COURT:  Right.

5              ATTORNEY PERKINS:  -- while we litigate the matter in

6    New York and allow the motion to amend.  All right.  We're

7    content, by the way -- maybe this is what Your Honor's getting

8    at.  We're content to have the stock sit in the JP Morgan joint

9    account in New York while this gets sorted out.

10             THE COURT:  All right.  So, Ms. Ross, your side

11    started the fight in New York State.  It's not been dismissed.

12    They just were unsuccessful in the preliminary injunction

13    round.  Is that where you want to go and resolve these

14    questions, since you started it down there?

15             ATTORNEY ROSS:  No, no, Your Honor, that is not where

16    we want to go.  We actually expected, frankly, for this to be a

17    really pretty simple matter of, What does the Vermont writ of

18    attachment say and mean, and what was it intended to mean in

19    July 2022 when it was entered into?

20        And so, when I was retained in November of 2022, the first

21    thing I did was call plaintiffs' counsel to see if we could get

22    an understanding of, Did they really mean this to apply to

23    stock titled solely in Mr. Wittekind's name?  And they said,

24    No, we don't, just as they said in their initial response to

25    this motion, to our motion to clarify, and there's no way that

1    anybody could have interpreted it to so apply to stocks only

2    given, only titled to Mr. Wittekind.  Doesn't need to be

3    clarified, because nobody could possibly interpret it to have

4    applied to stocks titled in his name.

5         And I explained, Well, that's exactly how JP Morgan has

6    interpreted it.  I, you know, they've made clear in this New

7    York filing that they think that there's this Vermont writ of

8    attachment out there, and they're not interested in doing

9    anything that might run afoul of it, understandably.

10            THE COURT:  Right.

11            ATTORNEY ROSS:  And so they took the position both

12   with me and with Mr. Wittekind's prior counsel, Just go get

13   some clarification from the Vermont court about what is

14   intended, and we'll happily release Mr. Wittekind's shares.

15   Just do that.  That's the, the most straightforward course of

16   action.  Everybody still seems to agree that that's the most

17   straightforward course of action, and by everybody I mean both

18   Mr. Wittekind and JP Morgan, which is why they filed a

19   stipulation in the New York action saying, JP Morgan's not

20   going to answer the complaint.  We don't want to go further

21   with this litigation until we give the Vermont court time to

22   clarify its writ of attachment, the idea being that case might,

23   no further litigation might be necessary, depending on this

24   court's clarification of the writ of attachment.

25        So, you know, as this court is well aware, a prejudgment

1    writ of attachment is an extraordinary measure of relief, and

2    the burden is borne entirely, entirely by plaintiff's counsel

3    to show that they are entitled to attach assets and, in this

4    case, to attach assets titled to a person who everyone agrees

5    is not the tortfeasor in this case.  He has nothing to do with

6    the underlying wrongful death action.

7            THE COURT:  Yeah.  No.  That part I get.  The part I

8    don't get is he put his, the consequence of depositing it into

9    a joint account, and that has, that's different than depositing

10   it, the, the shares, into his own JP Morgan account.  Had he

11   done that, we wouldn't be having this conversation.  But you've

12   read the cases too.  The Vermont Supreme Court looked at this

13   in 2014 in the divorce context when the mother-in-law had put

14   some of her money into the son's account, and it raises

15   questions about, about presumptions and, and about the party's

16   intent.

17       So the fact that it, they came in with his name on it,

18   just like I open an account with you and the check comes from

19   me and I put it in, doesn't mean it stays indissolubly mine

20   when we put it into our joint account.

21           ATTORNEY ROSS:  Well, Your Honor, I have two

22   responses to that.  The first is that the original writ of

23   attachment was not sufficiently specific, and the plaintiffs,

24   it's the plaintiffs who draft that and who have the burden to

25   draft that.

```
 1              THE COURT:  Right.

 2              ATTORNEY ROSS:  It didn't say what -- you know, it

 3   didn't say, Well, how many shares of Dr. Gumrukcu's?  It didn't

 4   say where those shares are held, which has allowed to, this to

 5   develop into the present problem, which they can just, which,

 6   you know, meaning the plaintiff just can come up with new

 7   theories as they go along.  As opposed to what they knew on

 8   July 7th of 2022, they're now developing theories of, Oh, well

 9   these shares aren't titled in Dr. Gumrukcu's name, but there

10   might be some legal theory that says that it could be his

11   shares.  So this feels like a moving target, which is not what

12   a writ of attachment is supposed to be.  They did, the

13   plaintiffs, did not even know about, you know, this legal

14   theory or assert it back when they got the attachment.  So

15   that's the first issue.

16        The second issue, though, is that, as this Court correctly

17   points out in terms of the -- I think the Court's referring to

18   the Barrup case.

19              THE COURT:  Exactly.

20              ATTORNEY ROSS:  What the Barrup case says is that

21   there is a presumption that, if there is a joint account, then

22   each party holds equal shares --

23              THE COURT:  Right.

24              ATTORNEY ROSS:  -- 50/50.

25              THE COURT:  Right.
```

```
 1              ATTORNEY ROSS:  What that means, since there is 16
 2    million shares in the joint account, under that theory -- my
 3    apologies.
 4              THE COURT:  No, take your time.  Yeah, I get it.
 5    There would only be 8 million available.
 6              ATTORNEY ROSS:  Yes.
 7              THE COURT:  But it's a rebuttable presumption.  It
 8    just says to the judge, You have to have a hearing if anybody
 9    has evidence about the party's intent.  It doesn't say it's
10    automatically 50/50.  It says, unless somebody puts up their
11    hand and testifies, there is a presumption of equal ownership.
12         But I thought the more important thing, Barrup is really
13    about execution.  We're not at that stage, may never be.  We're
14    at the stage of garnishment or attachment, and it says that the
15    joint tenants' interest is subject to garnishment, to being
16    held on to, until we figure out the facts.
17              ATTORNEY ROSS:  So I, I didn't see that case as -- I
18    mean, here we're talking about withholding.  You know, if you
19    want to say it's the rebuttable presumption is 50/50, you're
20    holding $8 million that belongs to somebody who is definitely
21    not the tortfeasor.  If the plaintiffs are going to put on some
22    evidence to rebut that presumption, I need to know what that
23    is.  They're the ones who sought the attachment.  They haven't
24    even cited Barrup as applying.  Again, I feel like we're
25    dealing with a little bit of a moving target when the
```

1   plaintiffs bear the burden of proof on showing that they're

2   entitled to hold Mr. Wittekind's shares.

3      I would further submit, though, that we have submitted

4   evidence that shares titled in Mr. Wittekind's name are

5   3,600,000 -- it's attached to our very first filing, the number

6   of shares titled in his name -- and that those, you know, those

7   are the factors that the Court considers in terms of

8   determining the party's intent if they are not, if the Court is

9   not going to go with a 50/50 rebuttable presumption.

10          THE COURT:  Well, the 50/50 rebuttable presumption

11   exists.

12          ATTORNEY ROSS:  Right.

13          THE COURT:  It's just whether you, whether the

14   attorneys accept that result or put on contrary evidence of

15   their own.

16          ATTORNEY ROSS:  So I guess, Your Honor, I guess the

17   point I'm making is I feel like I'm arguing against myself.

18   Yes.  Will we take 8 million instead of 3.6?  Sure.  If the, if

19   the plaintiffs want to argue that they have evidence that it

20   should be something different, we'll respond to that.

21          THE COURT:  All right.  But, certainly, back to the

22   original point, your choice of venue to decide the attachment

23   issues is here in the court which issued the attachment order;

24   is that right?

25          ATTORNEY ROSS:  That's correct, Your Honor.

1          THE COURT:  Right.

2          ATTORNEY ROSS:  And it's my understanding that, you

3     know, JP Morgan feels the same way, given that they entered

4     into a stipulation waiting to see what this court does before

5     anybody takes further action in New York.

6          THE COURT:  All right.  Anything more to add on what

7     I call the flea flicker, which is that we sort of lateral this

8     case off to New York and then wait to see what they do?  It's

9     an extremely unappealing proposition from a sort of judicial

10    perspective, because I don't know what's going to happen.  It

11    could be reached in seven years.

12         ATTORNEY PERKINS:  Two things, Your Honor.  We agree,

13    it could be interminable, and, if the Court is saying that the

14    preference is for us to bring JP Morgan into this case, we

15    will, we will do it.  However, I want to be clear, because I

16    think there may have been some misunderstanding.  The fault is

17    mine.  We believe that the Court, this Court, should decide the

18    attachment issues.  We believe that the New York court should

19    decide the ownership issues.  We would not be asking the New

20    York court to decide the attachment issues.

21         And, just to respond to something that Ms. Ross said about

22    our initial position and how the writ of attachment is written,

23    we did request an attachment on all of Mr. Gumrukcu's shares of

24    stock, and, at the time, we didn't know that he owned --

25         THE COURT:  Yeah, I get it.

```
1              ATTORNEY PERKINS:  -- the shares of stock in the
2    joint account.
3              THE COURT:  Right.
4              ATTORNEY PERKINS:  We do now, and we think that the
5    position that JP Morgan has taken is the correct legal
6    position, and the ownership issues are complex, but they do
7    mandate that those shares, regardless of whose name they're
8    titled in, that are in that account remain under attachment.
9              THE COURT:  All right.
10             ATTORNEY SHELKROT:  Your Honor, may I be heard on
11   this issue?
12             THE COURT:  Oh, of course.
13             ATTORNEY SHELKROT:  Thank you.  Lisa Shelkrot, for
14   the record.
15             THE COURT:  Yes, thanks.
16             ATTORNEY SHELKROT:  Your Honor, I just want to
17   respond to the question about why JP Morgan isn't here and do
18   they need to be here.  I think we're all in agreement at this
19   point that they're not here because the plaintiffs haven't
20   brought them here, but I don't think they need to be here.  I
21   don't think this court needs JP Morgan in the proceeding.  It
22   seems to me quite clear that all that needs to happen is really
23   the very simple thing that plaintiffs should have arranged to
24   have happen in the first place, which is to specify exactly
25   which shares they're talking about.
```

1    What Mr. Perkins has just said is that, when they first

2    filed the request for the writ of attachment, they only knew

3    about the 12 million shares, and that's probably true.

4              THE COURT:  Right.

5              ATTORNEY SHELKROT:  And they couldn't have gotten an

6    attachment on something they didn't know existed in the first

7    place.  The only thing they could get an attachment on and the

8    only thing they ever should have had an attachment on is the

9    shares that they asked for the attachment on, namely the ones

10   they knew existed, the 12 million.

11        That's perfectly obvious, too, in plaintiffs' motion to

12   clarify, I'm sorry, motion to enforce, which they filed in

13   November.  They specified that there were 12,073,272 shares

14   titled to Mr. Gumrukcu.  They wanted those shares delivered to

15   the court.  That's what they thought their motion, their writ

16   of attachment covered.  The fact that they have refused or

17   opposed the idea that there should be a clarification has only

18   served to allow them to take advantage of the ambiguity,

19   because now it is a moving target.

20        So, originally, it started out thinking, This is great.

21   We have an attachment on 12 million shares.  That's what we

22   want.  Terrific.  Let's get that enforced.  Since they asked to

23   have that enforced, they've discovered that maybe there's a

24   theory by which they could get an additional attachment on

25   additional shares, but they haven't asked for it.  They've just

1    asked the Court to retroactively interpret its original
2    attachment as applying to something that they didn't know
3    existed in the first place.  That is not how attachment works.
4    They're supposed to identify the asset with specificity, bring
5    it to the Court, have an attachment, serve it.
6              THE COURT:  All right.  So they need 30 days to file
7    any amended pleading, right?  Because it happens that
8    plaintiffs don't know where the money is and who's holding it,
9    and the attachment process is a little bit of blind man's bluff
10   until you kind of find out what there is, because you don't
11   know the defendant's business.  And I think you're absolutely
12   right, that's what's happened here.
13             ATTORNEY SHELKROT:  Well, the plaintiffs have had
14   eight months to do that, Your Honor, and they haven't done it.
15             THE COURT:  Well, everybody has been absent for eight
16   months.  I mean, for a while, even your client had no lawyer
17   and then an anonymous lawyer and then, thank heavens, you've
18   come in in the traditional role of advocate, but for a while I
19   was dealing with a scrivener that was providing pleadings to
20   Dr. Gumrukcu for him to file as if, as if he was pro se.  So
21   everybody has been kind of missing.
22             ATTORNEY SHELKROT:  I'm not sure I would agree with
23   that characterization.  Plaintiffs have filed a surreply and a
24   sursurreply and a motion to amend.  I guess I'm not sure I
25   agree with the characterization that they've been absent here.

1   They seem to have been litigating pretty vigorously, and

2   they've done a lot of things, but they haven't filed a new

3   motion for a writ as to shares that are titled to

4   Mr. Wittekind.  I don't think they can get that as a matter of

5   law.

6           THE COURT:  Right.

7           ATTORNEY SHELKROT:  But they haven't asked for it,

8   and it, certainly, it hasn't been for lack of briefing.

9           THE COURT:  All right.  So maybe --

10          ATTORNEY PERKINS:  Your Honor, may I respond?

11          THE COURT:  Maybe I can make a few things -- I'm not

12  going to take you up on your invitation to wait for the New

13  York court to do something.  I just don't -- it's my

14  responsibility to deal with the attachments that this court

15  issues.  It's common for federal courts to have to look into

16  the law of other states.  I started that process with New York.

17  I have not gotten very far with California.  I'll look for, to

18  all of you for guidance as to kind of who provides the relevant

19  substantive property law.  Doesn't seem to me obvious that it's

20  necessarily New York, because the accounts, the physical

21  certificates are in New York.  But we can talk about that.

22          But we'll, I will rule up and down on the attachment.

23  I'll give you 30 days if you need to file an amended

24  application in light of new facts.

25          And I, that takes me to Number 4.  I've been thrashing

1    around on my own through the UCC.  As best as I can tell, the

2    law governing attachment and execution of securities would be

3    Article 8, Section 112.  Is that how you all see it?  You may

4    not have found your way to it yet either.  I kind of got there

5    last night.

6              ATTORNEY PERKINS:  We do see it that way, Your Honor,

7    yes.  We think that, we think that there are ownership issues

8    that are governed by law, the law of New York involved here.

9              THE COURT:  Right.

10             ATTORNEY PERKINS:  But, yes, we do see this UCC

11   provision.

12             THE COURT:  Ms. Ross, the same?  I just want to put

13   my hand on the right tool, that's all.

14             ATTORNEY ROSS:  Yes, Your Honor, I believe we view it

15   the same way.  And, and my apologies.  I just need to make an

16   objection for the record to giving plaintiffs another 30 days

17   with, to amend their attachment.  I, you know, I have my

18   correspondence with Michael Hanley in which I advised him on

19   November 8th -- I think that was three days after I got

20   retained -- that there were stock certificates and that they

21   were, these certificates, were held at JP Morgan.

22        So the fact that they didn't bother to look into that from

23   November 8th until now and that it continues to impact an

24   innocent bystander who is not part of the wrongful death

25   action, Mr. Wittekind, you know, we simply don't think they

1     should be entitled to 30 more days to get another bite at the

2     apple.

3             THE COURT:  No, fair enough.  At least you won the

4     first half, which was which court decides.

5             ATTORNEY ROSS:  Thank you.

6             THE COURT:  All right.  Now, Number 5 is specifically

7     for you, Ms. Shelkrot.  With respect to the 12 million shares

8     that bear Dr. -- he prefers Dr., right?

9             ATTORNEY SHELKROT:  Yes, Your Honor.

10           THE COURT:  Yeah, that bear Dr. Gumrukcu's name,

11    would an attachment be appropriate in this case as to those?

12    In other words, is there any dispute about the proof and, and

13    likelihood of success, all of the attachment substantive law in

14    light of his indictment?

15          ATTORNEY SHELKROT:  So I want to be very clear that

16    I'm not conceding anything.

17          THE COURT:  Right.

18          ATTORNEY SHELKROT:  And I am not waiving the right to

19    seek a dissolution of that attachment at some point in the

20    future.  As the Court says, the burden is on the plaintiffs to

21    prove a likelihood of success on the merits.  I'm not

22    contesting that.  I haven't moved for dissolution, but I am not

23    foregoing the right to do so at some point in the future, and I

24    don't concede that there is a likelihood of success on the

25    merits.  I'm just not contesting it and haven't moved for

1    dissolution at this point.

2              THE COURT:  All right.  Maybe a more narrow way to

3    put my question is, Would you seek an evidentiary hearing on

4    this issue now, or are --

5              ATTORNEY SHELKROT:  That's a better question.  Thank

6    you, Your Honor.  I'm not, at this time, seeking an evidentiary

7    hearing on that question.  I will say, however, that the Court

8    asked a moment ago about that 12 million shares, and I think

9    the plaintiffs should be careful what they ask for, because, to

10   the extent that they take the legal position that all these

11   shares, the 12 million titled to my client and the 4 million

12   titled to Ms. Ross's client, that they're all jointly held, I

13   think the plaintiffs do run the risk that they only have a

14   legal right to 8 million of them or none if they're all tenancy

15   by the entireties.

16             THE COURT:  Right.

17             ATTORNEY SHELKROT:  So, as Ms. Ross said, I don't

18   intend to argue against myself and concede that 12 is the right

19   number.  I think the law will sort out how it does.  If

20   plaintiffs are going to pursue the position that it's all one

21   bundle, that may come out the way they want it, and it may come

22   out substantially to their detriment.

23             THE COURT:  Yeah.  I have, at this point, absolutely

24   no idea, and fortunately nobody plans to sell anything.  The

25   question is just freezing the asset.  So one of the things I'll

1    do is enter a short order making it clear that, at this stage

2    without prejudice to Dr. Gumrukcu's position at some future

3    time, the showing for an attachment on the 12 million shares

4    has been made and that much of the asset is attached, and we

5    will kind of fight on about the 3.6 million and, I suppose, the

6    89,000, the small, jointly held certificates.

7          So I don't think anybody wants an evidentiary hearing,

8    right?

9          ATTORNEY SHELKROT:  No.  I just want to ask.  Is that

10    going to be a written order?

11          THE COURT:  Yeah.  Yes.

12          ATTORNEY SHELKROT:  All right.  Thank you.

13          THE COURT:  Yeah.  No, I wouldn't expect us all just

14    to remember it.  I'll get something out.  I, it will be a

15    regular written decision, a dozen pages or so.  So does anybody

16    seek an evidentiary hearing beyond today's argument?  Ms. Ross?

17          ATTORNEY ROSS:  I think the answer to that is "no",

18    and the only reason I'm hesitating is because I want to make

19    sure I understand what we're talking about procedurally.  So

20    let me say this:  No.  However, should there be some request

21    for attachment by the plaintiffs that's, you know, goes beyond

22    the 12 million shares and we have this further discussion --

23          THE COURT:  Right.

24          ATTORNEY ROSS:  -- I think the answer is still "no",

25    but I'd like to see what they're going to put forward as

 1    evidence before I make that decision.

 2                  THE COURT:  Yeah, that's totally fair, and, if you

 3    file an amended application, you can let me know how you intend

 4    to prove it up.

 5                  ATTORNEY PERKINS:  Certainly.

 6                  THE COURT:  All right.  So I'll table that.  Let's

 7    change subjects totally to the fraudulent transfer claim.

 8    There are kind of two futility-based objections raised by

 9    Mr. Wittekind.  One gets right into the weeds of the elements

10    of the fraudulent transfer statute, and I would rather decide

11    that in the context of an amendment and a motion to dismiss

12    kind of fully briefed with a, with a complete record and the

13    possibility of, of changing it into a summary judgment motion

14    myself if I thought it really was sort of fact-based.  So I'll

15    set that one aside.

16        But I was, on the face of things, I didn't see the basis

17    for personal jurisdiction over Mr. Wittekind in Vermont, who

18    appears to be a stranger to our state.  I guess my question is,

19    I, I hear your argument that the minute he filed anything,

20    including his limited appearance, he put his hand in the monkey

21    trap, and he was stuck, but, apart from that legal argument, is

22    there some other basis for personal jurisdiction?

23                  ATTORNEY PERKINS:  There may be, Your Honor, but, at

24    this point, you know, it's early in the case, and it's early in

25    the case, because we just got an answer from Mr. Gumrukcu, but

1   there may be.  We, our argument is not solely that, you know,

2   that there is some gotcha rule out there that you intervene and

3   you consent.  It's the request for relief that's critical in

4   this case, and that's what every court that we have seen has

5   decided.  Once you intervene and request relief, even if it's

6   under Rule 24(a), you consent to personal jurisdiction.

7        The only court that we found that opposes that is *SEC v.*

8   *Ross* out of the Ninth Circuit, which was cited in the Second

9   Circuit opinion that was cited in Ms. Ross's memo that had

10  nothing to do with intervention.  And what *Ross* said was, Yes,

11  every court that has decided this issue under Rule 24(a) has

12  concluded that, by intervening to protect your property

13  interest, you consent to the personal jurisdiction of the

14  court.

15       However, in this case, we don't think that that automatic

16  rule should apply, because the intervenor went to great lengths

17  from the very beginning to object to personal jurisdiction over

18  him.  Our position is that has not been done in this case.

19  Mr. Wittekind has filed many, many memos.  So have, and he has

20  filed many, many memos on behalf of his companies, and it

21  wasn't until the motion to amend was filed that they objected

22  to personal jurisdiction.  So we think they've consented to

23  personal jurisdiction.

24            THE COURT:  And how about for the two real estate

25  holding corporations?  Because I didn't think they'd even gone

1    so far as to object.  They had nothing to do with the JP Morgan
2    attachment.  How would they be properly before this court?  All
3    they do is own a mansion and a warehouse or whatever it is.
4          ATTORNEY PERKINS:  Right.  Well, we, same theory,
5    Your Honor.  They filed a notice in this court at the time that
6    they were listing the residence that one of the LLCs owned for
7    sale.  That residence, by the way, is the marital home of
8    Mr. Gumrukcu and Mr. Wittekind.
9          THE COURT:  Yeah, I figured, yeah.
10         ATTORNEY PERKINS:  Right, right.  So they were, they
11   say they weren't seeking any particular order, but that notice
12   was seeking some kind of acknowledgement from this court that
13   there was no attachment over them, because Mr. Gumrukcu had
14   allegedly withdrawn, and, in connection with that, they filed a
15   document that wasn't true in this court to show that
16   Mr. Gumrukcu had withdrawn from the corporation, transferred
17   all of his shares back to the limited liability company,
18   transferred all the shares back to the limited liability
19   company for no consideration.
20        Additionally, we think that Mr. Gumrukcu, excuse me,
21   Mr. Wittekind, by virtue of his use of the LLC to buy the
22   marital home, is functioning as, is using the LLC to function
23   as an alter ego of Mr. Wittekind.  So we think that there is a
24   sufficient basis that the motion to amend should be granted and
25   this issue should be decided, would be better decided on a

1     motion to dismiss or after discovery and a motion for summary

2     judgment.

3               THE COURT:  Yeah, okay.  Ms. Ross?

4               ATTORNEY ROSS:  Thank you, Your Honor.  The Court

5     has, has really hit the nail on the head, which is that all

6     that Mr. Wittekind has done is file a motion to intervene that

7     is specifically titled that he is intervening for the limited

8     purpose of seeking clarification of the writ of attachment, and

9     he only did that after there were no choices left to him in

10    terms of this writ of attachment that was, again, not specific,

11    which is the plaintiffs' burden, was held against him.

12              So he talks to JP Morgan.  He files a complaint in New

13    York.  When everybody, when those avenues seem to turn to, Hey,

14    it is the Vermont court that's got to explain the writ of

15    attachment, but it's only them, and still he doesn't seek to

16    intervene.  He goes to plaintiffs' counsel and asks for

17    clarification.  Let's just get this resolved.  So only as a

18    last resort after everything else does he come to this court

19    and ask to intervene for the limited purpose of clarification,

20    because nearly $4 million worth of shares in his name are being

21    held as a result of this writ of attachment.

22              There is no way that subjects him to the personal

23    jurisdiction of this court.  He has no contacts with Vermont.

24    There has been no allegations that he has contacts with

25    Vermont.  He is a California resident.

1    With respect to the two companies, the, the plaintiffs'

2    argument is even thinner.  They do not seek to intervene.  They

3    did not ask this court for any relief.  They simply appeared as

4    a fact witness to say, Hey, everybody just be aware that, you

5    know, we, the companies, our view and our corporate counsel's

6    view is that Dr. Gumrukcu has no interest in these companies

7    and has had no interest since 2020.

8    That's not asking for relief.  They didn't ask for

9    clarification.  They didn't ask to dissolve.  They're just

10   bringing to the Court and the plaintiffs' attention, This is

11   the company's position after, and so, if you want to do

12   something about that, go ahead, plaintiff.  We're just letting

13   you know this is our position.  So that, that certainly does

14   not give personal jurisdiction over these two California

15   limited liability companies.  That would be like suggesting

16   that somebody who appears as a fact witness in an evidentiary

17   proceeding, there's suddenly personal jurisdiction.

18           THE COURT:  Yeah, I hear what you're saying.

19           ATTORNEY ROSS:  So, so, again, you know, this goes to

20   the heart of futility.  Personal jurisdiction should not,

21   should be decided at the outset, and somebody that there's just

22   no basis for thinking this court has jurisdiction should not be

23   drug into this court and into our proceeding.

24           THE COURT:  All right.  I'll give you the last word

25   if you need it.

 1          ATTORNEY PERKINS:  Well, Your Honor, what we don't
 2     know, because it's early in the case and because of the nature
 3     of these transactions that constitute the fraudulent transfers,
 4     is whether Mr. Wittekind conspired with Mr. Gumrukcu while
 5     Mr. Gumrukcu was in Vermont to engage in fraudulent transfers
 6     of assets to prevent Mrs. Davis from executing on any judgment
 7     that she might obtain in the future.
 8          THE COURT:  I don't think Mr. Gumrukcu was in Vermont
 9     until he was brought here by the Marshals Service.
10          ATTORNEY ROSS:  That's correct, Your Honor.
11          THE COURT:  Yeah.  What did you have in mind?
12          ATTORNEY PERKINS:  Yeah, that may be.  He was brought
13     here by the Marshals Service involuntary, correct?
14          THE COURT:  Right, in the fall of --
15          ATTORNEY PERKINS:  Right, okay.  Well, we're not
16     aware, we're not aware of him being in Vermont at this time,
17     but we just don't, we don't know whether there are additional
18     contacts that he's had with Vermont, but we do maintain that --
19          THE COURT:  But, as an officer of the court, you're
20     not telling me Mr. Wittekind was in Vermont?
21          ATTORNEY PERKINS:  No, no.
22          THE COURT:  Okay.  And, for that matter, Dr.
23     Gumrukcu, you just don't know?
24          ATTORNEY PERKINS:  Right.
25          THE COURT:  All right.  Those were kind of the

```
1    issues, and it's helpful.  I appreciate your putting up with my
2    agenda.  That, those were the questions that I had.  Why don't
3    I make sure, Ms. Ross, that you and everybody else has said
4    everything that you came here to say?
5                    ATTORNEY ROSS:  May I have a moment, Your Honor?
6                    THE COURT:  Of course.
7                    ATTORNEY ROSS:  I think Ms. Shelkrot does want a
8    further response with respect to her client, but, Your Honor, I
9    think, through the course of your questions and our discussion,
10   you've really gotten to the heart of what the issues are that
11   are raised.  You know, I did hear the Court say that, with
12   respect to who is a proper party separate and apart from
13   personal jurisdiction and what is a proper claim with respect
14   to the motion to amend the complaint, that you would prefer to
15   hear that in a motion to dismiss if we get there --
16                    THE COURT:  Yes.
17                    ATTORNEY ROSS:  -- if the personal jurisdiction
18   hurdle can be overcome.
19                    THE COURT:  Right.
20                    ATTORNEY ROSS:  So we have nothing further.
21                    THE COURT:  Okay.
22                    ATTORNEY ROSS:  Thank you, Your Honor.
23                    THE COURT:  Ms. Shelkrot?
24                    ATTORNEY SHELKROT:  Thank you, Your Honor.  So the
25   motion to amend and the motion to stay, in my view, are related
```

1    to each other.  And I understand that my motion to stay hadn't

2    been noticed for this hearing and the Court may not wish to

3    take it up at this time.

4              THE COURT:  I'm glad to, because I received a

5    response.  So I think it's been briefed and --

6              ATTORNEY SHELKROT:  Okay.  Well, thank you.  And so

7    those two things are related in my mind.  Obviously, the

8    personal jurisdiction issue is not the same for Ms. Ross's

9    client and for my client, and I haven't asserted a personal

10   jurisdiction argument with respect to the motion to amend.

11   However, I do still think there is that separate futility

12   argument, and I'm not sure.  Is that the argument that the

13   Court is saying we should take up in a motion to dismiss?

14             THE COURT:  In kind of a richer setting where, well,

15   there would be at least the prospect of more information.

16             ATTORNEY SHELKROT:  And I have no problem with doing

17   that, Your Honor.  I do want to caution, however -- and this is

18   where we, we stray into the motion to stay territory.  The

19   plaintiff has made it clear.  They've said that they intend to

20   do discovery, wish to do discovery on the issues that are

21   raised in their amended complaint as to these transfers, and

22   it's my position that there is no discovery that can be done

23   here without critically impairing my client's Fifth Amendment

24   rights and the integrity of the criminal trial.

25        It is simply not the case that it is possible to divorce

1    the transactions that they have in mind here as being
2    potentially fraudulent and the subject of the criminal case.
3    That criminal case, as the Court knows, is continuing to
4    evolve.  There was a third superseding indictment filed just
5    within the last couple of weeks.  Mr. Van de Graaf advised me
6    this week that he is continuing to investigate the case.  I
7    have no reason to think that we have arrived at a final version
8    of the charges.  I have no reason to think that there won't be
9    more charges filed, amplification of charges, new parties, or
10   new bases.  That is all still yet to come.
11       What we do know is that the criminal case already involves
12   fraud charges.  So it is not simply the murder for hire, it's
13   not simply the kidnapping, but there are allegations of fraud
14   contained within the existing indictment.
15       Those are not the same fraudulent allegations that the
16   plaintiffs are making in this civil case.  However, given the
17   fact that both the US government and the plaintiffs are
18   essentially pursuing similar theories, they are pursuing
19   similar fraudulent theories, there is no discovery that can
20   possibly be done involving my client on any of those issues
21   that won't absolutely threaten his right to a fair trial and
22   place him squarely in the dilemma of having to either defend
23   himself in the civil case or maintain his constitutional rights
24   in the criminal case.  It simply can't be done.
25       So I would object very strongly to the idea that

1    Dr. Gumrukcu should be required to do any sort of discovery in

2    the civil matter, and that is why I think it is imperative that

3    the case be stayed before there is any discovery at this point.

4        If the Court wants to entertain motions to dismiss on the

5    motion to amend or on an amended complaint, I'd be happy to

6    file those in the context of a 12(b) motion.  What I am

7    concerned about is the Court affording the opportunity to the

8    plaintiffs to do discovery and transform it into a summary

9    judgment kind of inquiry.

10        THE COURT:  Yeah.  No.  I hear what you're saying.

11    It's worried me, too, because one of the things that I think is

12    kind of open right now is, is this whole business of backdating

13    -- I won't get it quite right -- but the various corporate

14    instruments that bear one date, were signed months later.

15    There may be a completely innocent explanation for it.  Often,

16    there is, but even that would require a rather searching

17    inquiry.

18        But isn't the practical cost of the stay, which I

19    understand the reasons for it and I'm sympathetic to, is that

20    we hold everything else even too, hang on to all of the shares,

21    all of the real estate, don't go into the merits of these

22    claims until the criminal case has run its course?  Neither

23    side gets an advantage by delay.

24        ATTORNEY SHELKROT:  To the extent that it's about, to

25    the extent that it's about my client's property, I don't

```
 1    disagree with you, Your Honor, again, for these purposes
 2    without conceding that grounds have been met for the
 3    attachment.  For my client, I agree with that.  For my client's
 4    husband, there is very much a difference if the Court simply
 5    hangs on to shares that arguably belong to him.  And so that's
 6    where I think it's, and that's why I was very careful in my
 7    motion to stay to exclude the proceedings related to the writ
 8    of attachment.  I don't want a stay that is protecting my
 9    client's criminal constitutional rights to essentially
10    impoverish my client's husband.  That's not appropriate.
11    That's not fair.
12         So I don't mean to be unclear about that.  I, I would
13    intend, if the Court is going to allow amendment of the
14    complaint as to my client, I would want to have an opportunity
15    to file a motion to dismiss, again, a 12(b) motion, limited to
16    the pleadings that won't involve any discovery, simply to make
17    sure that there aren't assets involved, tied up that should
18    properly be belonging to my client's husband and that should be
19    at my client's husband's disposal.
20              THE COURT:  All right.  How do you guys see it?
21              ATTORNEY PERKINS:  Your Honor, we, first of all,
22    Mr. Wittekind is not impoverished.  We have letters that
23    Mr. Wittekind filed in the New York Supreme Court between him
24    and JP Morgan's counsel where he requested to withdraw many
25    thousands of shares of Enochian Biosciences from other accounts
```

1    at JP Morgan, and those requests were granted.

2              THE COURT:  Oh, he had individual accounts?

3              ATTORNEY PERKINS:  Yeah, well, we don't know the

4    nature of the accounts.

5              THE COURT:  I see.

6              ATTORNEY PERKINS:  They may be trust accounts.  We're

7    not quite sure.

8              THE COURT:  Okay.

9              ATTORNEY PERKINS:  With respect to discovery, I don't

10   hear, I haven't heard anything that, specific that would relate

11   the fraud, fraudulent transfers after the murder of Mr. Davis

12   to the fraud alleged by the United States prior to the murder

13   of Mr. Davis.  My understanding is that Mr. Gumrukcu was

14   charged under a superseding indictment for fraud in connection

15   with an oil futures deal he was making with Mr. Davis at the

16   time Mr. Davis was alive.

17        We're not seeking any discovery on that whatsoever, and,

18   as we made clear in our partial objection to the motion to

19   stay, we have no intention whatsoever of doing any discovery

20   related to the wrongful death, survival, intentional infliction

21   of distress, or other like claims relating to the murder of, of

22   Mr. Davis.

23        But we agree with the Court that, if the Court is inclined

24   to issue a stay, it should be a complete stay of the

25   proceedings, although we would ask that the Court rule on the

1     motion to amend prior to doing so, partly because we have

2     concerns about whether the statute of limitations is going to

3     run on some of the claims that we've made in connection with

4     the --

5               THE COURT:  Oh, I hadn't thought of that.  Yeah, I'm

6     with you.  Okay.  All right.  I, my questions are answered, but

7     I'm glad, if there's anything else to take up, happy to hear

8     it.

9               ATTORNEY ROSS:  Your Honor, this is Heather Ross,

10    and, for the record, and I'm just wanting to weigh in on the

11    issue of the stay in light of what's been stated.

12    Mr. Wittekind is, feels that the attachment of the JP Morgan,

13    related to shares held in a JP Morgan account needs to be

14    decided separate and apart from the stay and the fact that

15    these parties have other issues between them does not, should

16    not impact his right to finally get a ruling and clarification

17    on that issue.

18              You know, as Ms. Shelkrot stated, I, I think that what has

19    been alleged, if, with respect to the two LLCs and

20    Mr. Wittekind, the personal jurisdiction hurdle is overcome and

21    there is an allowance of an amended complaint, we, too, would

22    like the opportunity to file a 12(b)(6), because we think there

23    are some infirmities with the complaint.  So, like

24    Ms. Shelkrot, we would like that to take place and, and any

25    stay be thereafter.

```
 1              THE COURT:  All right.  Good enough.  Yes?
 2              ATTORNEY SHELKROT:  I know it looks like the Court is
 3     ready but --
 4              THE COURT:  There's no rush, no.  You've come a long
 5     way.  We've got all afternoon if you need it.
 6              ATTORNEY SHELKROT:  I drove all this way.  I should
 7     get to talk.
 8              THE COURT:  Exactly.
 9              ATTORNEY SHELKROT:  Your Honor, I just want to make
10     sure that there is no lack of, that there is no confusion about
11     how broad the indictment in this case may ultimately be, and we
12     simply don't know at this case, and we don't know where what is
13     now the civil case or the proposed civil case may over, may
14     overlap in, in future areas as to money issues with what the
15     criminal case is or will be.  I note Mr. Van de Graaf is here
16     in the courtroom today.  I'm sure he takes a keen interest in
17     what the Court is doing here.
18              THE COURT:  Keen is probably going a little, little
19     high, but a sporting interest.
20              ATTORNEY SHELKROT:  You think he had nothing else to
21     do, huh?
22              THE COURT:  Right.  He was here this morning on
23     another matter.
24              ATTORNEY SHELKROT:  Well, then perhaps it's just a
25     passing interest.  Nevertheless, it may be that the plaintiffs
```

1   are working with Mr. Van de Graaf.  The plaintiffs certainly

2   did allude in their motion to amend as part of their basis for

3   their, the idea that there has been fraudulent transfers here

4   on alleged fraudulent documents that were part of the criminal

5   indictment now.  So the issues are intertwined, and I believe

6   they, they certainly have the potential to become more

7   intertwined.

8        So I would ask again that, if the Court is going to grant

9   the motion to amend as to my client, it clarify that there not

10  be discovery on it and also that my client be permitted to file

11  a motion under 12(b) to dismiss, to address any issues with the

12  pleadings themselves.

13       THE COURT:  Oh, you mean including the substantive,

14  the attack on the substantive elements of the California

15  fraudulent transfer cause of action?

16       ATTORNEY SHELKROT:  I mean, whatever is -- I mean, my

17  preference would be for the Court not to grant the, to stay it

18  before granting a motion to amend.  If the Court is granting

19  the motion to amend, however, then I think that we should be

20  able to attack a deficiency on the pleadings themselves.  If

21  the plaintiffs fail to state a claim based on the *Iqbal/Twombly*

22  standard and their factual allegations, then it shouldn't be

23  allowed to stand in the meantime.

24       THE COURT:  Why?  What difference -- I don't

25  understand what difference it makes to you.  The case is

1    stayed.

2            ATTORNEY SHELKROT:  Well, because two or three of the

3    counts they have there seek an injunction on assets, and it may

4    then, again, further impair assets that are owned in part by

5    third parties.

6            THE COURT:  I think you want your cake and to eat it

7    too.  You'd like to go forward on the part of the case that's

8    your side, favorable to you, but you'd like discovery and all

9    other progress to, to stop.  It doesn't usually work that way.

10           ATTORNEY SHELKROT:  Well, as I say, my initial

11   request is that the Court defer the motion to amend as well.  I

12   don't think there -- I don't see that it causes a statute of

13   limitations issue if the plaintiff has filed it and the Court

14   hasn't ruled on it.  That seems to me that that's been

15   addressed at that point.  So I don't see --

16           THE COURT:  At least tolled or something?

17           ATTORNEY SHELKROT:  Yeah, exactly.

18           THE COURT:  I mean, it may be.  It must not come up

19   very often, because motions to amend are granted or denied in

20   short order.

21           ATTORNEY SHELKROT:  True enough.

22           THE COURT:  We usually don't wait years.

23           ATTORNEY SHELKROT:  True enough.

24           THE COURT:  So it's going to be a small body of case

25   law.  All right.  I've got, I think, plenty to think about.

1    Anything else?

2              ATTORNEY PERKINS:  I would just say, Your Honor, we

3    don't know what the effect would be upon a stay prior to

4    granting the motion to amend.  Probably be governed by

5    California law.  None of us are California practitioners,

6    unless I'm somehow mistaken.  I think the preference would be

7    to grant the motion to amend if the Court is inclined to stay

8    everything else.

9              THE COURT:  Right.

10             ATTORNEY PERKINS:  Thank you.

11             THE COURT:  Good enough.  Thank you.  I'll get

12   something out in a week or so, okay?

13             ATTORNEY PERKINS:  Thank you.

14             THE COURT:  Appreciate it.

15             ATTORNEY ROSS:  Thank you, Your Honor.

16             ATTORNEY SHELKROT:  Thank you.

17

18

19

20

21

22

23

24

25

```
1                        C E R T I F I C A T E
2              I, Sunnie Donath, RMR, Official Court Reporter
3      for the United States District Court, District of Vermont, do
4      hereby certify that the foregoing pages are a true and accurate
5      transcription of an audio recording of the hearing taken in the
6      above-titled matter on March 16, 2023 to the best of my skill
7      and ability.
8              I further certify that I am not related to any of the
9      parties thereto or their counsel, and I am in no way interested
10     in the outcome of said cause.
11
12
13
14
15                                  Sunnie Donath, RMR
16     --------------------------------
17                            Sunnie Donath, RMR
18
19
20
21
22
23
24
25
```